THE PEOPLE OF PUERTO RICO, ETC., Plaintiff and Appellant, v. MANUEL ACEVEDO ROSARIO, Defendant and Appellee.

No. 9104. Argued June 1, 1945.—Decided December 10, 1945.

*Jesús A. González,* Acting Attorney General, *Fernando B. Fornaris,* Assistant Attorney General, and *Federico Tilén* and *Domingo Candelario,* Legal Advisors of the Department of the Interior, for appellant. *R. Cuevas Zequeira* for appellee.

Mr. Justice Todd, Jr., delivered the opinion of the court.

After plaintiff's evidence had been introduced, the District Court of San Juan granted a motion for nonsuit presented by the defendant and dismissed the complaint. Plaintiff appealed and contends that the court erred. The facts are as follows:

Plaintiff executed a contract with the defendant on April 30, 1941, for the construction of a part of Highway No. 2, between the bascule bridge and the entrance to Camp Buchanan, it being stipulated that the work should be finished by May 4, 1942. When it appeared that the contractor was not going to finish the work on said date, and due to the fact that said road was urgently needed for purposes of national defense, the plaintiff, through the Commissioner of the Interior, decided to rescind the contract and finish the work by administration; and to that end the parties agreed to said rescission by virtue of a contract, drawn up in English, which in its pertinent part reads thus:

"That the Commissioner of the Interior, as party of the first part, and Manuel Acevedo Rosario, as party of the second part, do mutually agree and consent to the rescission of said contract in the manner and form stipulated *in the memorandum of February 5, 1942,* suscribed to by both parties.

"That the rescission of said contract is hereby agreed upon and accepted by both parties to the contract subject to the terms and conditions hereinafter set forth:

"1. That the party of the first part, in the name and on behalf of The People of Puerto Rico, agrees to acquire by purchase from, the party of the second part, for the sum of eighty thousand ($80,000) dollars all of the necessary equipment acquired by said party of the second part for the construction of said FAP 8–D (1) works, whether the same has been used or is available for future use in connection therewith, as per inventory marked 'Exhibit A' attached hereto and made to form part of this instrument.

"2. That the party of the first part *shall make* settlement for and pay to the party of the second part, for all work executed up to and including *February 5, 1942,* in accordance with the computations *made* to that effect by the engineers and accepted by the party of the second part, on the basis of the unit price stipulated in the contract.

"3. That the party of the first part shall make a just and reasonable settlement for all extra or additional works which may have been executed during the term the contract was in force.

"4. That all rights or interest in or liability under the contract, shall cease between the parties *and the sureties thereto upon the execution of this instrument.*

"5. That The People of Puerto Rico through its Department of the Interior shall take charge of the works and of their *execution as of February 6, 1942,* from which date and thereafter the party of the second part shall have no right to or intervention whatsoever with the equipment, works, personnel nor with anything relating or pertaining to said contract.

"6. The party of the first part shall cause to be returned to the party of the second part, such Workmen's Compensation Premiums as he may have paid pursuant to law, to which he may be entitled as a result of the rescission of the contract prior to the date fixed for its execution. As to any excise taxes which the party of the second part may have paid in connection with the execution of said contract, in case the party of the first part and the Treasurer of Puerto Rico should have no power to return said taxes, then the party of the first part promises to introduce a bill in the Legislature authorizing the return of such taxes as may correspond in proportion with the works not executed." (Italics ours.)

It is important to take notice here of the dates mentioned in this contract. It should be noted that the contract for

rescission was executed on February 17, 1942, but it is stated therein that the same was to have retroactive effect to February 5, 1942; and that the plaintiff took charge of the work on the following day, February 6.

The complaint in this case was filed almost a year later, that is, on February 4, 1943, and amended at the trial, plaintiff praying that the defendant be ordered to restore $41,260.55 which was allegedly paid by the plaintiff through an error committed in certain computations made by the engineers in connection with the amount of the material. excavated by the defendant from certain hills in order to fill in the road. Upon analyzing plaintiff's evidence, the lower court in its opinion said:

"Upon starting the construction, Engineer Girod of the Department of the Interior made a survey of the hills, taking notes in his field books and preparing later, based on these data, drawings and profiles showing the contours of the hills before the excavations were started.

"When defendant finished the excavations another survey was made by Engineer León of the Department of the Interior and taking this survey as a basis, new profiles were made showing the contours of the hills when defendant finished the work. There does not exist nor has there ever existed any controversy as to the correctness of the drawing made by León. The controversy arose upon making the computation of the excavations *for the purpose of fixing the basis* for the agreement of February 17, 1942, in connection with the profiles made by Girod. They were challenged by the defendant. When the engineers went to compare Girod's drawings with the data taken down in the field books, the books were not found. A representative of the defendant then offered some data which he said had been copied from Girod's books. Upon basing the preparation of the profiles on said data, the same were different from those made by Girod and upon computing the excavations based on these new profiles, there appeared an excess of about 70,000 cubic meters over the figures obtained when using the profiles prepared by Girod, and an excess of about 50,000 cubic meters over the amount of excavations deposited in the road.

"Notwithstanding these discrepancies, *and in view of the urgent need which the Government had to stettle and liquidate the difference*

448

*with the defendant,* the Department of the Interior decided to accept defendant's computations, making them its own, stating that they represented 'the computations made by the engineers and accepted by' the defendant.

"\* \* \* \* \* \* \*

"We do not know, nor is it disclosed by the pleadings or the evidence, whether, if the Department had been sure that 'the computations made by the engineers' were erroneous, it could have made a more favorable settlement. In effect, on February 17, 1942, the Department had in its possession all the data which it needed to have, at least, the moral conviction, if not the certainty, *that defendant's claim for the excavations was exaggerated.* The Department knew that the amount which defendant alleged to have excavated was 50,000 cubic meters in excess of the excavations which, according to the certifications of the Department, defendant had deposited in the road, and that it exceeded by about 70,000 cubic meters the computations made taking as basis the profiles prepared by its own engineers, Girod and León. And it knew, or if it did not, it could have been informed, by merely questioning its engineer, Girod, that the data supplied by the defendant had not been copied from the notes taken down by Girod, because Girod testified that no copy had been made of those notes. It is perfectly clear that the Department accepted the computations presented by the defendant, not because it believed them to be correct, *but because the Government was in urgent need of a settlement.*" (Italics ours.)

Appellant assigns as the only error committed by the lower court, that upon granting the motion for nonsuit it reached "an erroneous conclusion in weighing plaintiff's evidence," and argues that such conclusion is to the effect that the computations of the work done by the defendant appellee had been made and the value of said construction had been determined by the parties upon executing the contract for rescission on February 17, 1942, and that this value previously determined had been a part of the consideration of said contract for rescission. Parting from this conclusion as correct, the lower court understood that the action had been brought in order to obtain the recovery of part of the consideration of the agreement, the proper action being one for the annulment of said agreement "because of an error

which invalidated the consent of one of the parties." Appellant further contends that the error of the lower court consists in having misconstrued the second clause of the contract for rescission in its phrase *"in accordance with the computations made to that effect by the engineers and accepted by the party of the second part,"* and maintains that when said contract was signed the computation had not been made.

We believe that the conclusion of the court is supported by the terms of the contract and by the evidence.

As we have already said, it appears from the contract that although it was signed on February 17, its terms had already been stipulated in a memorandum signed by the parties on February 5. Although said memorandum was not presented as evidence, it seems to us that the second clause of the contract clearly shows that the payment had to be made according to the computations made between those dates and accepted by the defendant. Moreover, the evidence showed, as held by the lower court, that the plaintiff, despite the fact that it knew that a discrepancy in the computations existed, paid the defendant, not because it believed that said computations were correct, but because even if they were incorrect, it was anxious to compromise. Upon being examined by the trial judge, witness Angel Dos Silva. engineer of the Department of the Interior, answered:

"Q. And did you not realize this *before* making payment?—A. We realized it but, as I explained a minute ago, outside pressure was so strong that any delay was going to cause damage or bring more protest from the public and the armed forces; so that this work was done under heavy pressure.—Q. Then, you realized that there existed a difference *before making payment,* that there existed a considerable difference between the data given by Lugo and what appeared as having been partially delivered, a difference of some 50,000 meters?—A. *Yes, we realized that there was such a difference."* (Italics ours.)

Even assuming, as maintained by appellant, that the computations had not been made when the contract of rescission

was signed, we are of the opinion that the main point in this case, in order for this action to be successful, is that at the time of making payment to the defendant, the same should have been made through an error of fact, inasmuch as this is an action for the recovery of money unduly paid, which action, according to § 1795 of the Civil Code, lies "If a thing is received when there was no right to claim it and which, through an error, has been unduly delivered, . ." Construing the scope of this Section we have decided, after citing authorities and cases, that ". . . in order to constitute the quasi-obligation to pay back money unduly collected two requisites must be shown, viz., (1) that it was unduly paid and (2) that the payment was made through error or mistake and not through mere liberality or any other sufficient cause. The error giving rise to the quasi-contract must be of fact and not merely of law." *American R. R. Co. of P. R.* v. *Wolckers*, 22 P.R.R. 264, 269.

Commenting on this quasi contract Sánchez Román says:

"It is, therefore, an indispensable requisite of this quasi contract that the error committed by the one who pays should have been of fact; for if he paid unduly, *knowing that he should not have paid*, or if he paid being aware of the fact, but through an error of law, because the money could not have been recovered in a civil action, for example, a debt by virtue of a natural obligation, there does not exist a quasi contract of undue payment, nor may he claim its recovery, it being decided that his intention was to make a gift." (Italics ours.) *Derecho Civil*, vol. 4, p. 1004.

In the case at bar, as we have said plaintiff paid with knowledge that an error existed and was induced by reason of the urgency which it explained. Payment was not made through an error of fact but "by mere liberality or for any other cause," that is, due to the urgency of the case by reason of the war emergency.

As Colín and Capitant state,[1] "when payment of what is not due is made with the knowledge that the alleged creditor

---

[1] *Derecho Civil*, vol. 3, p. 943.

was not entitled to receive it, the fact is no longer governed by the condition of the quasi contract but falls within another order of juridical relations."

The judgment appealed from must be affirmed.